## ROIG v. PEOPLE OF PUERTO RICO.

### No. 3985.

Circuit Court of Appeals, First Circuit.

Jan. 29, 1945.

---

Rafael Castro Fernandez, of San Juan, Puerto Rico (James R. Beverley, of San Juan, Puerto Rico, of counsel), for appellant.

David L. Kreeger, Sp. Asst. to Atty. Gen. (Francis M. Shea, Asst. Atty. Gen., Fowler Harper, Sol., Department of the Interior, Irwin W. Silverman, Chief Counsel, Division of Territories and Island Possessions, Department of the Interior, Shirley Ecker Boskey, Atty., Department of the Interior, and James L. Morrisson and Phyllis Jane Campbell, all of Washington, D. C., of counsel), for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and SWEENEY, District Judge.

MAHONEY, Circuit Judge.

The Puerto Rican Sugar Act of 1942[1] declares that "the manufacture, processing, and refining of sugar" are "public-service enterprises" and provides that no one may engage in such an enterprise without a franchise from the Public Service Commission of Puerto Rico.[2]

This action was brought by the Attorney General in the name of The People of Puerto Rico, pursuant to § 55[3] of the Act, for an injunction restraining the defendant from operating one of its sugar mills for which it had failed to obtain a franchise.

---

[1] Act No. 221 of the Legislature of Puerto Rico, approved May 12, 1942. Its official short title is an "Act Regulating the Sugar Industry of Puerto Rico."

[2] "Section 12.—The manufacture, processing, and refining of sugar are declared public-service enterprises, and no natural or artificial person shall engage in Puerto Rico in such enterprises without having obtained a franchise in accordance with the provisions of this Act. Sugar companies, as they are defined in Section 2 of Chapter 1 of this Act, are declared public service companies, and every natural or artificial person that engages in Puerto Rico, as owner, lessee, or otherwise, in the manufacture, processing, or refining of sugar is likewise declared to be a public service company."

"Section 18.—Thirty days after this Act takes effect, every sugar company, as defined in Section 2 of Chapter 1 of this Act, and every person engaged in Puerto Rico in the manufacture, processing, or refining of sugar, shall be under the jurisdiction and subject to the authority of the Commission, and no natural or artificial person may engage in the manufacture, processing, or refining of sugar unless he requests and obtains from the Commission a franchise authorizing him to do so. Every franchise, privilege, or concession for engaging in Puerto Rico in the manufacture,

processing, or refining of sugar shall be issued by the Commission according to the rules and regulations that the Commission may establish in accordance with the provisions of the Organic Act and of this Act."

"Section 2.—The term 'sugar company', as used in this Act, means any natural or artificial person who, in Puerto Rico, in accordance with the provisions of this Act, engages as owner, lessee, operator, administrator, possessor, or otherwise, in the manufacture, processing, or refining of sugar. The term 'sugar company' also includes any natural or artificial person who in any manner acquires sugar cane for conversion into raw or refined sugar, or acquires raw sugar for refining, as well as any natural or artificial person who in any manner acts as an intermediary, business agent, or broker between a sugar company and its colonos."

[3] "Section 55.—The Attorney General, in addition to the exercise of the powers and duties conferred upon him by law, shall also, upon request of the Commission or of his own motion, proceed in the name of The People of Puerto Rico, by mandamus, injunction, or quo warranto, or other appropriate remedy at law or in equity, to restrain violations of the provisions of this Act or of the orders of the Commission or of the judgment, orders, or decrees of said court, or to enforce obedience thereto."

The defendant is a civil law partnership engaged in the cultivation of sugar cane and the manufacture of sugar for distribution and sale in the market. It owns and operates two sugar mills in the District of Humacao. At the Central Roig it grinds its own cane and serves the public by grinding the cane of independent farmers or colonos. In January, 1943, it got a provisional franchise from the Public Service Commission for this mill. It decided to use its other mill, the Central El Ejemplo, exclusively in the grinding of partnership cane and refrained from obtaining a franchise for that mill since there it would not be offering to serve the public by the grinding of the cane of independent colonos. The Central El Ejemplo is a relatively small mill operating at substantially below its grinding capacity. The maximum capacity of the mill is 140,000 tons annually. Only 90,000 tons were ground in 1943 and only 110.000 to 112,000 tons were ground in 1942. In the year before the Act went into effect approximately 2% of the cane ground by this mill belonged to independent farmers. Those farmers who might still be interested in grinding their cane at Central El Ejemplo have access to four other mills including the Central Roig. From the testimony taken at the hearing it appears that the true motive for not submitting to the Public Service Commission was an economic one in that the regulations were too expensive.[4]

The District Court granted a preliminary injunction restraining the defendant from operating the Central El Ejemplo without a franchise. The Supreme Court of Puerto Rico affirmed that action, and from the entry of its judgment and order denying reconsideration the defendant has taken this appeal.

The appellant contends first, that the legislature lacks power and authority to convert a private business, the sugar mill here, into a public service enterprise so long as its owner refrains from serving the public; and second, that the Sugar Act, in attempting to convert all sugar mills in Puerto Rico into public service enterprises, forces all owners to serve the public against their will, in violation of the due process clause of the Organic Act of Puerto Rico and the Constitution of the United States. We shall consider these arguments in inverse order.

In its opinion the Supreme Court rejected the contention "that since El Ejemplo does not grind the public's cane, its business is not included among those dedicated to a public use" and held merely that all sugar mills were subject to reasonable regulation and must obtain franchises whether they offered to serve the public or not. The court stated expressly:

"The fact that the appellant is required to ask for and obtain such franchise does not mean that it is equally required to accept any or all the terms and conditions that said franchise may contain. The legality of all regulations to which it may be subjected will always be subject to judicial investigation and decision."

■ As construed by the court below, the Sugar Act does not convert all sugar mills into public service enterprises *and* force them to serve the public. It merely requires all sugar mills to submit to the Public Service Commission by taking out

[4] Antonio Roig testified in part that the planter is entitled to 65% of the sugar produced by this cane except in some cases where it is 63%; that some farms are so small they produce less than three tons of cane annually; that of the 1800 tons of cane estimated for the present year, 1100 tons belong to one planter; that only one planter is closer to the Central El Ejemplo than to any of the other mills; that there are some suitable sugar lands in the district where planting is made impracticable because of transportation difficulties; that transportation and hauling expenses should be not over 60¢ per ton if sugar production is to be economical.

On cross-examination Roig testified that the independent farmers' cane is so small in volume that it causes a loss to the Central; and that the new regulations are so expensive it is impossible for a small mill to submit to them and survive. The franchise expenses referred to are the royalty imposed by the Public Service Commission, the tax imposed by the Treasurer of Puerto Rico on the franchise; and the salary of the chemist-inspector alleged to be seven times higher than what they used to pay and higher than the income to the partnership from 1000 tons of cane. Roig testified that the volume of independents' cane at the Central Roig was 60,-000 to 70,000 tons and that the margin of profit there justified the franchise expenses. This would seem to indicate the franchise expenses for Central El Ejemplo would be economically justified if the mill were operated at maximum capacity.

franchises. We cannot say that that construction of the statute is "patently erroneous" or "inescapably wrong." Bonet v. Texas, 308 U.S. 463, 60 S.Ct. 349, 84 L.Ed. 401; DeCastro v. Board of Tax Commissioners, 322 U.S. 451, 64 S.Ct. 1121. The power of the Public Service Commission to force a mill to serve the public against its will, therefore, is not before us on this appeal.[5]

The appellant's first contention that the legislature lacks power to convert a private business into a public service company so long as its owner refrains from serving the public resolves itself into the question whether the appellant may be compelled, consistent with the requirements of due process, to obtain a franchise as a public service company to grind its own sugar cane pursuant to the requirements of the Sugar Act of 1942.

The grinding of sugar cane is the principal industry of Puerto Rico, upon the success or failure of which turn the most vital economic problems of the island. The population averages 501 persons per square mile. Over 70 per cent of the people live in rural areas and are dependent upon agriculture for a livelihood. The island averages less than one acre of tillable land per rural inhabitant. Sugar is the chief crop, and 70 per cent of the sugar lands are controlled by companies owned by absentee owners. These companies produce approximately 50 per cent of the sugar output and control better than 40 per cent of the island's agricultural wealth. Sugar in value constitutes two-thirds of the exports.[6]

Sugar cane produces a cash income only upon grinding, and the independent farmers or colonos are therefore dependent upon the grinding mills or centrals. These represent a capital investment over and above the resources of most farmers. Two factors impel them to send their cane to the nearest mill for grinding. One, sugar cane is a perishable product which must be ground within twenty-four hours of harvesting; and two, transportation is expensive and must be kept to a minimum if there is to be any net profit for the farmer.[7]

In 1937, the Legislature of Puerto Rico passed Act No. 112.[8] This statute affected the mills in that it set up formulæ to be followed by them in determining the sugar content of cane; fixed the percentage of yield which must be returned to the independent farmer, regulated the time of payment, set standards for the cane, and required the central to grind colono cane within twenty-four hours of delivery to the mill. This act was repealed in 1942 by Act No. 221, the act in question here.

The appellant concedes and this court recognized in Vidal v. Fernandez, 1 Cir., 1939, 104 F.2d 606, certiorari denied 308 U.S. 602, 60 S.Ct. 139, 84 L.Ed. 504, the fact that the sugar industry is vested with a public interest, and it does not contest the power of the legislature to regulate, under the police power, a private business vested with the public interest. Olsen v. Nebraska, 313 U.S. 236, 62 S.Ct. 862, 86 L.Ed. 1305, 133 A.L.R. 1500; Nebbia v. New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Munn v. Illinois, 94 U.S. 113, 24 L.Ed. 77. The Supreme Court of Puerto Rico found that the Central El Ejemplo was a business substantially affected with the public interest and said:

"When a business is substantially affect-

---

[5] Section 43 of the Act provides that the Public Service Commission must determine the production zone of every mill in every final franchise issued by it. Section 4 of the Act defines the term "production zone" as "the territorial demarcation within the limits of which is cultivated the sugar cane which is to be converted into raw sugar or refined sugar, or where it is in effect converted into raw sugar by any sugar company or by any natural or artificial person engaged in Puerto Rico in the manufacture, production, processing or refining of sugar."

The Supreme Court noted that "whether or not the determination of the production zone * * * is reasonable, is a matter which, at the proper time, may be resolved by the courts."

[6] See Vidal v. Fernandez, 1 Cir., 104 F. 2d 606, 609, certiorari denied 308 U.S. 602, 60 S.Ct. 139, 84 L.Ed. 504; People v. Rubert Hermanos, 53 P.R.R. 741, 752; Census of Puerto Rico (1935).

When Puerto Rico was taken over by the United States from Spain in 1898, the title to most of the arable land was held by a few. To deal with the problem of agricultural monopoly Congress passed the so-called 500 acre law setting quantitative limitations upon the ownership of land. Until very recently this law was honored more in the breach than the observance.

[7] See Vidal v. Fernandez, supra; People v. Rubert Hermanos, supra.

[8] Approved May 13, 1937; as amended in 1938 by Act No. 213. Upheld in Vidal v. Fernandez, supra.

ed with a public interest, whether or not it has been dedicated to a public use, this interest on the part of the community at large must prevail. Appellant admits the power of the legislature to regulate its business in regard to prices, contracts and wages and hours. Could there be any better indication of the public interest attendant upon the grinding by appellant of its own cane? Moreover, the appellant's mill is not dedicated to the manufacture or elaboration of sugar for its own consumption, but for sale in competition with the sugar produced by other sugar companies. On the industrial and economic activities of all these companies, including appellant, vitally depends the general welfare of a large portion of the community of Puerto Rico. It would be absurd to hold that the interest of the public in the sugar industry is limited solely to the grinding of cane by some mills, but not by others, depending on whether the cane to be ground belongs to the colonos or to the mills. As long as appellant dedicates itself to the cultivation and grinding of cane for sale to the public of the sugar produced therefrom, all its activities are of interest to the public and therefore subject to reasonable regulation. No matter how small the link that Central El Ejemplo may constitute in the chain of the sugar industry, this link has its proportional effect on the economy of the district wherein it is located and the country in general. To exclude appellant from the operation of Act No. 221 would be tantamount to an acknowledgment that such exclusion, in itself, may weaken the scope of the regulation that the legislature sought to impose upon the entire sugar industry.

"As was well said in the Nebbia case, when private interests are opposed to the public interest and subject only to constitutional guarantees, the public interest must prevail."

▇ Since the powers of the Insular Legislature are broad and comprehensive and are very much like the powers of any state legislature, decisions dealing with the validity of state regulations under the "due process" clause of the Fourteenth Amendment apply. People of Puerto Rico v. Shell Co., 302 U.S. 253, 262, 58 S.Ct. 167, 82 L.Ed. 235; cf. Hornbuckle v. Toombs, 18 Wall. 648, 655, 656, 21 L.Ed. 966. In W. W. Cargill Co. v. Minnesota, 180 U.S. 452, 21 S.Ct. 423, 45 L.Ed. 619, the United States Supreme Court upheld a state licensing statute as applied to a warehouseman who stored and shipped only his own grain. That statute declared grain elevators and warehouses to be public elevators or warehouses and required them to obtain licenses and submit to state regulation. Like the Sugar Act, the statute forbade discrimination in rendering service, authorized a public agency to fix rates, inspect properties and company books, and required reports of business transacted. Also like the Sugar Act,[9] it contained a broad separability clause. The State Supreme Court upheld the validity of the licensing requirement irrespective of whether the other provisions of the statute applied to a warehouse handling only its own grain. The Supreme Court sustained the construction placed on the statute by the state court and said:

"that the provision requiring a license from any person, firm or corporation proposing to engage in the business described in the first section embraces the defendant company; that such provision may stand alone; and that its validity may be determined without references to other provisions of the statute."

▇▇ In the present case the court below is merely requiring the appellant to obtain authorization from the Public Service Commission to operate its mill. By requiring a franchise the court in effect construed the word "franchise" as "license" and used it in the same sense in which "license" was used in the Cargill case, supra. The appellant contends that while the word "franchise" has been used occasionally as a synonym for "license", it cannot be given such a meaning here. However, we believe such was the intent of the Su-

---

[9] "Section 71.—It is hereby declared that the provisions of this Act are separate from each other, and separate as to the subject-matters respectively considered therein; and if, for any reason, one or more of such provisions be judicially held to be void as applicable to any subject-matter related to such provision, or be held void in anywise for any reason, such judicial holding or decision shall not affect the validity of such provision or provisions as applicable to other subject-matters dealt with therein, or the validity of the remaining provisions of this Act. It is hereby declared that the said provision, and the said remaining provisions, would have been enacted notwithstanding such judicial determination of the invalidity of any of said particular provision or provisions, in any respect."

preme Court and we find no "patent error" in that construction. Furthermore, it is consistent with our reluctance to decide a constitutional question until obliged to do so. Blair v. United States, 250 U.S. 273, 279, 39 S.Ct. 468, 63 L.Ed. 979; See Brandeis concurring in Ashwander v. T. V. A., 297 U.S. 288, 341, 56 S.Ct. 466, 80 L.Ed. 688.

■ The Act provides for the regulation of working conditions for sugar mill employees.[10] The appellant concedes that their wages and hours of employment are subject to regulation in the public interest. The Act also contains various provisions [11] for the submission of reports, inspection of facilities and records, and supervision of security issues. With the acknowledged public interest in the sugar industry the provision for the submission of information and reports by this appellant is a regulation the legislature "could have regarded as important in itself and could have made the subject of a separate statute. The fact that it is found in a statute imposing other regulations * * * does not deprive it of its essential character and its capacity to stand alone. Regulation requiring the submission of information is a familiar category." Electric Bond & Share Co. v. Securities and Exchange Commission, 303 U.S. 419, 437, 58 S.Ct. 678, 684, 82 L.Ed.

936, 115 A.L.R. 105. The Central El Ejemplo has not been called on to serve the public and even if it is never required to do so information as to its grinding capacity would be useful information for the Public Service Commission in determining production zones for those mills engaged in serving the public, and it would be material in determining the production zone for the Central El Ejemplo [12] regarding the cane fields of the appellant now divided between that mill and the Central Roig.

■ We do not think the Supreme Court of Puerto Rico committed reversible error in determining that this appellant must obtain a franchise to operate the Central El Ejemplo. Under the construction placed on the Sugar Act by that court the terms and conditions of a franchise are subject to judicial review when they are imposed. There is no doubt that this mill is subject to some regulation by the Public Service Commission, but here we are only concerned with the enfranchising requirement itself. The requirement of a franchise in this case may be employed as the license was in the Cargill case, supra, to make effective those regulations which will apply to this appellant.

The judgment of the Supreme Court of Puerto Rico is affirmed with costs to the appellee.

---

[10] "Section 13.—It shall be the duty of every sugar company: (a) To furnish and maintain such service, including facilities, as shall in all respects be just, safe, reasonable, adequate, and practically sufficient for the convenience of its colonos, employees, and the public, and in conformity with such regulations or orders as may be made by the Commission."

"(p) To give immediate notice to the Commission of any accident in connection with the operation of its property, facilities, or service, wherein any person shall have been killed or injured. Said report shall be submitted within such time and in such manner as the Commission may by general rule or special order or otherwise require. Such report shall not be open for public inspection, except by order of the Commission, and shall not be admitted in evidence for any purpose in any suit or action for damages growing out of any matter or thing mentioned in said report."

[11] §§ 13(g), (m), 15, 16, 22, 23, 29, 30, 31, 34, 35, 37, 42, 62.

[12] "Section 42.—Within one year counting from the date of approval of this Act, the Commission shall proceed to determine and to put in force the production zone of every sugar company and of every natural

or artificial person who is engaged in Puerto Rico in the manufacture, processing, or refining of sugar.

"For the purpose of fixing such production zones, any duly authorized official or agent of the Commission shall have free access to the accounting books of every sugar company and of every natural or artificial person who is engaged in Puerto Rico in the manufacture, processing, or refining of sugar, as well as to any source of information that the Commission may deem necessary. Every natural or artificial person and every sugar company and every official, employee, or agent thereof who performs any act that impedes, hinders, or delays the fixing of such production zones by the Commission, or who fails, omits, neglects, or refuses to perform any duty or obey any order issued by the Commission for such fixing, shall be guilty of a misdemeanor and, upon conviction, shall suffer the maximum penalty of one year in jail or five thousand (5,000) dollars fine, or both penalties, in the discretion of the court. The district courts of Puerto Rico shall have jurisdiction to take cognizance of such violations, in a court without a jury."